## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **THE BOEING COMPANY** and **THE BOEING COMPANY RETIREE HEALTH AND WELFARE PLAN,** )<br>)<br>) | |
| Plaintiffs, ) | |
| v. )<br>) | |
| **LORI M. MARCH, WILLIAM G. TAKACS,** and **THE INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW,** )<br>)<br>)<br>)<br>)<br>)<br>) | |
| Defendants. ) )<br>) | Nos. **06 CV 4997 (lead)** **07 CV 3555 (closed member)** |
| **JOHN R. MAYFIELD, ROBERT MECLEARY,** and **THOMAS J. SHERIDAN,** on behalf of themselves and a similarly situated class, )<br>)<br>)<br>) | **HONORABLE DAVID H. COAR** |
| Plaintiffs, ) | |
| v. )<br>) | |
| **THE BOEING COMPANY** and **THE BOEING COMPANY RETIREE HEALTH AND WELFARE PLAN,** )<br>)<br>) | |
| Defendants. ) | |
| **THE BOEING COMPANY** and **THE BOEING COMPANY RETIREE HEALTH AND WELFARE PLAN,** )<br>)<br>) | |
| Counter-Claimants, ) | |
| v. )<br>) | |
| **JOHN R. MAYFIELD, ROBERT MECLEARY,** and **THOMAS J. SHERIDAN,** on behalf of themselves and a similarly situated class, )<br>)<br>)<br>) | |
| Counter-Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

These two cases, which involve claims under the Employee Retirement Income Security Act of 1974 and the Labor-Management Relations Act, were consolidated for all purposes. In both matters, the Boeing Company seeks a declaration that a series of collective bargaining agreements negotiated by Boeing with the UAW and Local 1069 (collectively, "the Union") did not vest lifetime health benefits for the following class:

> All former employees of Boeing who retired from Boeing Rotorcraft before March 18, 2006; who, as employees, were represented by the Union in collective bargaining; and who are participants in the Retiree Health Plan (i.e., those currently participating in The Boeing Company Retiree Health and Welfare Benefit Plan (Plan 502) and receiving pension benefits under the Local 1069 Non-Contributory Retirement Plan (Plan 005)); and their spouses, same-gender domestic partners, and eligible dependents, and surviving spouses and eligible dependents, who are participants in the Retiree Health Plan, as described above.

Boeing also seeks a declaration that it has the right to modify, amend, or terminate class members' health benefits. On September 30, 2008, this court certified the class for all pending claims in the consolidated litigation.

Represented by lead plaintiffs John R. Mayfield, Robert Mecleary, and Thomas J. Sheridan, the class argues that Boeing does not have a unilateral right to modify class members' health benefits under the current collective bargaining agreement (CBA). Specifically, they protest the changes Boeing made to those benefits in September 2006 and July 2009. The UAW, for its part, also considers these changes to be a breach of the CBA and a violation of Boeing's obligation to provide lifetime benefits to retirees. It contends, however, that the court lacks subject-matter jurisdiction over Boeing's claims against the Union.

The UAW, the class, and Boeing each have filed motions for summary judgment. This opinion resolves the three motions.

# I. JURISDICTION

Before delving into the substantive dispute, the court considers its jurisdiction over each claim in the consolidated litigation. The court begins this analysis by briefly identifying the parties and recounting the litigation's history.

## A. Background

On one side of the dispute is the Boeing Company ("Boeing") and the Boeing Company Retiree Health and Welfare Plan ("Retiree Health Plan"). Boeing is a Delaware corporation with its corporate headquarters and principal place of business in Chicago, Illinois. One of its divisions, Boeing Rotorcraft (which went by other names in the past) has manufacturing facilities in Ridley Township, Pennsylvania ("the Ridley plant"), and at the Wilmington Airport in New Castle County, Delaware ("the Wilmington Airport facility"). At all relevant times, Boeing has been an "employer" within the meaning of Section 3(5) of ERISA, 29 U.S.C. § 1002(5), and the "plan sponsor" of the Retiree Health Plan within the meaning of Section 3(16)(B) of ERISA, 29 U.S.C. § 1002(16)(B). The Retiree Health Plan, meanwhile, is an "employee welfare benefit plan" within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1), and it is administered primarily in Chicago, Illinois.

On the other side are the named plaintiffs in the *Mayfield* complaint, John Mayfield, Robert Mecleary, and Thomas Sheridan ("*Mayfield* plaintiffs"); the named defendants in the *March* complaint, Lori March and William Takacs ("*March* defendants"); and the International Union, United Automobile, Aerospace & Agricultural Implement Workers ("UAW") and UAW Local 1069 (collectively, the "Union"). The *Mayfield* plaintiffs all retired from Boeing Rotorcraft before March 6, 2006, and the court has ruled that they adequately represent the class

certified for this consolidated litigation. The *March* defendants were served on September 23 and September 21, 2006, respectively; they have not participated further in the litigation.

The class representatives and members are "participants" in the Retiree Health Plan, within the meaning of Section 3(7) of ERISA, 29 U.S.C. § 1002(7). Mayfield retired in 1988; Mecleary retired in 1999; and Sheridan retired in 2003. While employed at Boeing, Mayfield, Sheridan, and Mecleary were represented in collective bargaining by the UAW and UAW Local 1069, which are labor organizations as defined in Section 2(5) of the National Labor Relations Act, 29 U.S.C. § 152(5).

On August 21, 2006, the UAW and four retirees filed a class action-complaint in the Eastern District of Michigan (the "*Wood* complaint"). They voluntarily dismissed that complaint on September 13, 2006—the day the *Mayfield* plaintiffs filed suit in the Middle District of Tennessee. Two days later, Boeing and the Retiree Health Plan filed its declaratory complaint against the retirees and the Union in the Northern District of Illinois. The *Mayfield* complaint was subsequently transferred to this court, and the two actions were consolidated.

Both the *Wood* and *Mayfield* complaints contained an allegation that Boeing's changes to the retirees' health benefits breach its contractual obligation to provide vested, lifetime health benefits to the class. And both complaints included an allegation that the changes breach Boeing's obligations under the Retiree Health Plan. Finally, both complaints sought, under the LMRA and ERISA, a declaratory judgment that Boeing is obligated to provide health benefits to the class for the lives of the retirees and their surviving spouses; preliminary and permanent injunctive relief requiring Boeing to maintain the level of benefits established in the applicable collective bargaining agreements; and damages plus interest for any losses incurred as a result of the benefit changes.

### B. Analysis

There is no dispute that the court's jurisdiction over the class's amended complaint (formerly known as the *Mayfield* plaintiffs' amended complaint) is secure under section 301 of the LMRA, 29 U.S.C. §185 and 29 U.S.C. § 1331, which empowers the court to resolve the class's claim for injunctive relief and damages for breach of a collective bargaining agreement. And the court has jurisdiction under sections 502(a)(1)(B), 502(a)(3), 502(e), and 502(f) of ERISA, 29 U.S.C. §1132(a)(1)(B), 1132(a)(3), 1132(e) & 1132(f), and 29 U.S.C. § 1331, to resolve the class's claims for benefits due, to clarify the class's rights to future benefits under an employee welfare benefit plan, and to enjoin illegal changes to an employee welfare benefit plan. Jurisdiction over Boeing's declaratory complaint, however, is more complicated.

Boeing does not dispute that it lacks independent standing to sue under section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), because it is not a participant, beneficiary, or fiduciary, as those terms are defined in the Act. Boeing argues, though, that the court has subject-matter jurisdiction over the ERISA claims in its declaratory complaint because the retirees and the Union could bring (and indeed have brought) a coercive action against Boeing. The Union and the retirees disagree: they both argue that Boeing may not use the Declaratory Judgment Act, 28 U.S.C. § 2201, to "piggyback" on their standing under ERISA. The Union argues, moreover, that Boeing has not shown that the Union would have standing to bring ERISA and LMRA claims on behalf of the retirees—in other words, that there is any standing to "piggyback" on. Finally, the Union contests whether Boeing may bring an LMRA claim without alleging a contract violation. The court addresses each of these contentions below.

1. "Coercive Action" Jurisdiction Over Boeing's ERISA Claims Against the Class

Relying primarily on the fact that Congress expressly limited private ERISA claimants to participants, fiduciaries, and beneficiaries, the Union argues that Boeing, an employer, may not subvert congressional intent by using the Declaratory Judgment Act to bring a claim it otherwise would not have standing to pursue. In a separate brief, the class joins, without elaborating, the Union's argument. Boeing responds that its declaratory complaint raises a substantial federal question because the class and the Union could (and in fact did) file a lawsuit alleging a violation of section 502 of ERISA, and federal-question jurisdiction would exist over such claims. And Boeing contends that, if a plaintiff invokes the Declaratory Judgment Act, there is no requirement that it have "independent standing" to sue under ERISA. Because the court has separate reservations about its jurisdiction over Boeing's claims against the Union, the court focuses here on Boeing's ability to "piggyback" on the class's standing.

This court has jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.SC. § 1331. And, under the well-pleaded complaint rule, a federal question must be evident on the face of the plaintiff's complaint. *City of Beloit v. Local 643*, 248 F.3d 650, 652 (7th Cir. 2001). The court may exercise jurisdiction only "where it is specifically authorized by federal statute," and the Declaratory Judgment Act itself does not provide independent jurisdictional footing. *Newell Operating Co. v. UAW*, 532 F.3d 583, 587 (7th Cir. 2008). (citation and quotation marks omitted). Thus, in a declaratory-judgment action, the well-pleaded complaint rule requires the court to assess whether a federal question would be present had the declaratory defendant filed suit against the declaratory plaintiff over the subject matter in the complaint. *City of Beloit,* 248 F.3d at 652; *Primax Recoveries, Inc. v. Sevilla*, 324 F.3d 544, 548 (7th Cir. 2003).

Because ERISA occupies the field of law related to employee-welfare plans, disputes regarding these plans generally arise under federal law. *See Spitz v. Tepfer*, 171 F.3d 443, 447 (7th Cir. 1999); *Ceres Terminals, Inc. v. Industrial Commission of Illinois,* 53 F.3d 183, 185 (7th Cir. 1995). There are, however, exceptions—disputes that concern an employee-welfare plan but do not "arise under" ERISA. *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1 (1983), the main case upon which the Union relies, is an example.

In *Franchise Tax Board*, a state tax authority was trying to levy funds from an ERISA vacation-benefit plan, to apply the money to unpaid state income taxes. *Id.* at 3. When the trustees refused to turn over the funds, the tax authority filed suit in state court, seeking (1) enforcement of the levy under state law, and (2) a declaration that the trustees of the plan had a duty under state law to relinquish levied funds from the trust, notwithstanding their obligations under ERISA. *Id.* at 14. The trustees sought and obtained removal of the suit to federal court, but the Supreme Court concluded that there was no federal jurisdiction. The Court found applicable the *Skelly Oil* doctrine, which demands that "if, but for the availability of the declaratory judgment procedure, the federal claim would arise only as a defense to a state created action, jurisdiction is lacking." *Id.* at 16; *see Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667 (1950). Applying the *Skelly Oil* doctrine, the Court ruled that the state's claims did not arise under federal law because its suit for a declaration of the validity of its own tax-levying law, despite possibly conflicting federal law, "is sufficiently removed from the spirit of necessity and careful limitation" that defines the scope of federal jurisdiction. *Franchise Tax Board,* 463 U.S. at 21-22. Thus, it did not matter that the *trustees* could have brought in federal court a declaratory-suit (under ERISA, alone) to determine whether they could comply with the levy.

*Id.* at 20, 26-27.  The *state's* complaint, even if it was certain to require interpretation of ERISA, did not arise under federal law.

The Union (and the class) contend that *Franchise Tax Board* thus requires that a declaratory plaintiff advancing claims under ERISA itself have standing to sue under the statute.  One court in this circuit has so held, *see Pabst Brewing Co. v. Corrao*, 176 F.R.D. 552, 560-61 (E.D. Wis. 1997), *aff'd on other grounds*, 161 F.3d 434 (7th Cir. 1998), but other courts, in this circuit and elsewhere, have rejected this interpretation.  *See BorgWarner Diversified Transmission Prods v. UAW*, No. 1:06-cv-058-LJM-WTL, 2006 U.S. Dist. LEXIS 30101 (S.D. Ind. May 12, 2006); *Bowe Bell + Howell Co. v. IMMCO Employees' Ass'n*, No. 03 C 8010, 2004 U.S. Dist LEXIS 10264 (N.D. Ill. June 2, 2004); *Prudential Ins. Co. of Am. v. Doe*, 76 F.3d 206, 210 (8th Cir. 1996).  The interpretation relies in part on the following passage in *Franchise Tax Board*:

> The express grant of federal jurisdiction in ERISA is limited to suits brought by certain parties as to whom Congress presumably determined that a right to enter federal court was necessary to further the statute's purposes.  It did not go so far as to provide that any suit *against* such parties must also be brought in federal court when they themselves did not choose to sue.

463 U.S. at 21 (citation and footnote omitted) (emphasis in original).

This court does not read this passage, or *Franchise Tax Board* generally, to set forth an independent standing requirement for declaratory suits under ERISA.  Rather, in this passage the Supreme Court was making a point in service of its broader holding:  In enacting ERISA, Congress did not intend for federal courts to have exclusive jurisdiction over any case involving an employee-welfare plan where a participant, beneficiary, or fiduciary was sued, irrespective of whether the claims presented in the complaint have a federal character.  The jurisdictional deficiency that the Court addressed in this passage was not that the declaratory plaintiff did not have independent standing to sue under ERISA (although that foreclosed a different

jurisdictional theory), but that the controversy presented in the complaint—a dispute about the validity of a state tax-levying regulation—was not within the carefully circumscribed ambit of federal jurisdiction.

The Seventh Circuit, for its part, has not directly commented on the Union's "independent standing" argument. In its most recent examination of jurisdiction under ERISA and the Declaratory Judgment Act, the court did not have occasion to consider it. *See Newell Operating Co. v. UAW*, 532 F.3d 583 (7th Cir. 2008). The Seventh Circuit has explained, however, that in the context of a declaratory complaint a federal court's jurisdiction "comes from the underlying controversy, not the particular party initiating suit." *Ameritech Benefit Plan Comm. v. CWA*, 220 F.3d 814, 819 (7th Cir. 2000). Thus, it has found jurisdiction lacking for declaratory-judgment complaints where the presumed suit by the declaratory defendant would arise under state law. *See Primax Recoveries, Inc. v. Sevilla*, 324 F.3d 544, 548-49 (7th Cir. 2003) (declaratory complaint did not present federal question where, had it been filed by declaratory defendant, it would be to force endorsement of a check for reimbursement of funds recovered from a third party under state law); *Commercial Nat'l Bank of Chicago v. Demos*, 18 F.3d 485, 490 (7th Cir. 1994) (declaratory complaint did not present federal question because potential suit by declaratory defendant would raise only state-law question of ownership of accounts). And the court recently held that jurisdiction was secure over a declaratory complaint arising under a federal statutory provision that authorized suit by the declaratory defendant, but not the declaratory plaintiff. *See Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 935 (7th Cir. 2008) (finding jurisdiction secure because declaratory-defendant, an American-Indian tribe, could bring suit against declaratory-plaintiff, a state, under 25 U.S.C. § 2710(d)(7)(A)(i)).

Applying these broad principles here, the court concludes that Boeing may use the Declaratory Judgment Act to "piggyback" on the class's standing to sue under ERISA because the underlying dispute arises under federal law: whether an employer may make unilateral changes to retirees' benefits under an ERISA welfare plan is entirely a federal question, requiring interpretation only of federal statutes and federal common law, and not state law. And there is no dispute that the court would have jurisdiction under ERISA to resolve the class's presumed complaint against Boeing. Accordingly, the court's jurisdiction over the live controversies in Boeing's declaratory complaint against the class is secure.

2. Jurisdiction Over Boeing's ERISA Claims Against the Union

Boeing's ERISA claims against the Union present a different complication. In Boeing's amended complaint, the company and the plan administrator seek a declaration, enforceable against the Union on behalf of the class, that Boeing and the plan administrator may modify, amend or terminate the class's health insurance benefits, and that the September 2006 and July 2009 changes did not violate ERISA. The Union contends that the court lacks jurisdiction over these claims because Boeing has not shown that the Union has standing to represent retirees (or other members of the class). Boeing responds that the Union could bring ERISA claims on behalf of retirees based on its associational standing, and it notes that the Union in fact did so in the *Wood* complaint.

Under some circumstances, a union may sue on behalf of its members in its "associational capacity." *UAW v. Brock*, 477 U.S. 274, 281-82 (1986). Thus, while generally only participants, beneficiaries, and fiduciaries may bring claims under ERISA, 29 U.S.C. § 1132(a), the Seventh Circuit has held that a union may sue under ERISA on behalf of plan participants—its members—in an associational capacity. *See Southern Illinois Carpenters*

*Welfare Fund v. Carpenters Welfare Fund*, 326 F.3d 919, 922 (7th Cir. 2003). A due-process problem arises, though, when associations do not "represent adequately the interests of their injured members." *Brock*, 477 U.S. at 290.

The Union contends that Boeing has not shown that the Union would represent adequately the interests of the retirees. First, it notes that, as "members in retired status," retirees enjoy the same privileges of membership as active employees, but they lack critical voting rights: under Article 6, Section 19 of the UAW Constitution, retirees are not allowed to vote on the ratification of contracts, the election of stewards and committeepersons, and in decisions related to strikes. The Union contends that, particularly because the retirees are not empowered to choose the individuals who would be responsible for representing their interests in this lawsuit, it cannot be an adequate representative. Second, the Union notes that, because it is primarily responsible for its active employees, their interests will trump the retirees' interests in the case of conflict.

The Union has a point. *See generally Allied Chem. & Alkali Workers of Am. v. Pittsburgh Plate Glass Co.*, 404 U.S. 157 (1971). After all, the Union is not the retirees' exclusive bargaining representative. *See id.* For this reason, the Seventh Circuit has held, in the context of a union's motion to compel arbitration of retirees' grievances, that a union cannot represent retirees without a showing that the retirees assent to such representation. *Rossetto v. Pabst Brewing Co.*, 128 F.3d 538, 540 (7th Cir. 1997); *see also United Steel Workers of Am. v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 282-83 (6th Cir. 2007) (same). The *Rossetto* court reasoned that, because retirees are not employees included in a "bargaining unit" under the National Labor Relations Act, the union is not their exclusive bargaining representative, and they may deal with their former employer on their own. 128 F.3d at 539-40. Because the union in

that case had not shown that the retirees assented to its representation, the Seventh Circuit concluded that it lacked standing to seek arbitration of their grievances. *Id.* at 541.

Boeing insists that proof of the retirees' assent is unnecessary here because the Union already brought suit on behalf of the retirees (the *Wood* complaint), and, Boeing contends, there is no obligation to make such a showing in the context of a declaratory complaint. The court disagrees with both contentions. First, the fact that the Union has purported to represent the retirees says nothing about the retirees' assent. It's true that Retiree Chapter President Jerry Patrone, a Local 1069 official who served on the 1986 bargaining committee, testified that he would be comfortable with the Union representing the retirees' interests in this lawsuit, and Joseph Sinni, a Union representative, testified that the Union is "fully supportive" of the retirees' claims that they have lifetime benefits and would "stand behind" them. But even if the Union's stance in this case would be sympathetic to the retirees' own perspectives, the retirees cannot be bound to it without their consent. *Cf. Rossetto*, 128 F.3d at 540. Second, this court would have jurisdiction over the presumed suit by the Union on behalf of the retirees only if the retirees consent to its representation. Thus, the Union's standing is critical to establish the jurisdictional basis for Boeing's declaratory claims under ERISA. And Boeing, as the proponent of federal jurisdiction, bears the burden of proving this jurisdictional fact by a preponderance of the evidence. *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 543 (7th Cir. 2006).

The court concludes that Boeing has not shown, by a preponderance of the evidence, that the retirees would assent to the Union's representation in this matter. Indeed, Boeing has not presented *any* evidence of such assent. Accordingly, this court lacks jurisdiction over Boeing's declaratory action under ERISA against the Union. But the court notes that, even if its jurisdiction were secure over the claims, it would as a matter of discretion decline to entertain

them.  *See* 28 U.S.C. § 2201(a); *Newell*, 532 F.3d at 590 ("A district court has 'wide discretion' to decline to hear actions that pursue only declaratory relief.").  The retirees are represented here, a class has been certified, and the Union's participation is largely unnecessary.  Accordingly, the court dismisses Boeing's declaratory claims under ERISA against the Union.

### 3. Jurisdiction Under the LMRA

Boeing also asks the court to interpret the CBAs under the LMRA; it filed claims for declaratory relief against the class and the Union (both as an entity in itself and as a representative of the retirees in an associational capacity).  The Union contests the court's jurisdiction over these claims on the ground that Boeing has not alleged a violation of any contract.

In the *Wood* complaint, the Union alleged that Boeing had violated the CBAs.  Boeing now seeks a declaration that its actions have *not* been violations, and that if it were to make further changes it would *not* violate the CBAs.  The Union argues that, because Boeing does not contend that there has been a violation, its complaint does not fall within the strict jurisdictional contours of the LMRA.  Boeing responds that it does not need to allege that it violated the CBA to invoke the court's jurisdiction; it is enough that the Union has asserted as much, and has publicly declared that position by filing the *Wood* complaint.

The court concludes that its jurisdiction is secure.  Section 301 of the LMRA states:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).  Although the statute authorizes federal courts only to decide suits "for violation of contracts," it would be absurd to require that Boeing plead that it is violating the

CBA in order to proceed with its declaratory complaint. It is enough that the underlying controversy concerns whether there has been, or will be, a violation of the CBAs.

The nature of the controversy here distinguishes it from *Textron Lycoming Reciprocating Engine Div. v. UAW*, 523 U.S. 653, 657 (1998), the case upon which the Union relies. There the union sought a declaration that its collective bargaining agreement with an employer was invalid. Specifically, the union alleged that the employer had fraudulently induced it to sign the agreement by concealing its plans to subcontract work to non-union workers. *Textron*, 523 U.S. at 655. The union did not allege, however, that either it or the employer had ever violated the terms of their agreement. *Id.* For this reason, the Supreme Court concluded that the LMRA did not confer subject-matter jurisdiction over the union's claim. *Id.* at 661-62. The Court explicitly stated, however, that "a declaratory judgment plaintiff accused of violating a collective-bargaining agreement may ask a court to declare the agreement invalid" under the LMRA. *Id.* at 658. The problem in that case was that *no one* contended that there had been a violation.

The Seventh Circuit has ruled that *Textron* did not foreclose jurisdiction in a similar case, *J.W. Peters, Inc. v. Bridge, Structural & Reinforcing Iron Workers,* 398 F.3d 967 (7th Cir. 2005). There the employer was accused of violating the terms of a collective bargaining agreement by attempting to terminate the collective bargaining relationship without providing proper notice, and it sought declaratory relief from this alleged violation. Although the employer did not allege that it had violated the agreement, the Seventh Circuit described the suit as "for violation of contracts" within the meaning of § 301. *Id.* at 973. And more recently in *Newell*, the Seventh Circuit concluded that an employer's suit for a declaration that amendments to retirees' health benefits did not violate the CBA fell within the "jurisdictional contours" of LMRA § 301. *Newell*, 532 F.3d at 590. The court explained that the suit "involves the alleged violation of the

collective-bargaining agreement and therefore falls within the plain terms of LMRA § 301." *Id.* The Union has not explained why these cases do not control the outcome here, and the court sees no reason why they would not.

There is, however, a lingering standing issue for Boeing's claim against the Union under the LMRA and the Declaratory Judgment Act. Boeing has sued the Union both as a representative of—or "in behalf of"—the retirees, and the Union again challenges whether it may be sued in this capacity. It notes that LMRA § 301(b) provides that a "labor organization may sue or be sued . . . in behalf of *the employees whom it represents* in the courts of the United States," 29 U.S.C. § 185(b) (emphasis added), but retirees, the Union contends, are not "employees whom it represents." The Union also notes, again, that the retirees have not assented to its representation.

For the same reasons the court concluded that it lacked jurisdiction over Boeing's ERISA claims against the Union as a representative of the retirees, the court agrees. And, in the alternative, the court declines to exercise jurisdiction because the class can adequately represent the retirees' interests with respect to the LMRA claims in this suit. This does not, however, dispose of all of Boeing's LMRA claims against the Union. Unlike ERISA, the LMRA explicitly provides that a union may sue or be sued "as an entity." 29 U.S.C. § 185(b). And it is "axiomatic" that a party who negotiated a contract on behalf of a third party has standing to sue to enforce that contract. *See Rossetto*, 128 F.3d at 539; *Frontier Communications of New York, Inc. v. Int'l Brotherhood of Electrical Workers*, No. 07 Civ. 10327, 2008 U.S. Dist. LEXIS 37213, at *8-*12 & n.3 (S.D.N.Y. May 6, 2008) (collecting cases). Accordingly, the court concludes that its jurisdiction is secure for Boeing's declaratory-judgment claim under the LMRA against the Union as an entity itself.

With these jurisdictional knots untied, the court moves on to examine the merits of the class's complaint, Boeing's declaratory complaint against the class, and Boeing's claim for declaratory relief under the LMRA against the Union.

## II. FACTS[1]

**A. Retiree Health Coverage under the Current CBA**

Between 1956 and 2005, the Union participated in collective bargaining on behalf of hourly employees at the Ridley plant and the Wilmington Airport facility, negotiating a series of successive collective bargaining agreements ("CBAs") on their behalf. Since the 1971-74 CBA, every CBA through the current CBA has provided health insurance benefits to retirees in Article XVI.

<u>1. The Current CBA</u>

The Union and Boeing entered into the most recent CBA ("current CBA") on March 18, 2006. Article XVI, Section 5 of the current CBA says, "the Company will provide medical coverage for the duration of this agreement for retirees, their spouses, same-gender domestic partner, and eligible dependents . . . ."

For active employees and employees who retire during the term of the agreement ("future retirees"), the current CBA makes changes from the previous CBA to medical plan options, deductibles, copayments and benefit payment levels. The current CBA does not apply these changes to current retirees.

The current CBA also includes a change in Article XVI, Section 1, entitled "Eligibility and Effective Date of Coverage," which says:

---

[1] The facts presented here are undisputed, unless otherwise noted. Although each side has labeled some facts "disputed," if the basis for the dispute is not supported by competent evidence, the court treats the fact as admitted. *See* N.D. Ill. L.R. 56.1(a), (b)(3)(C). Similarly, if a fact is unsupported by competent evidence, the court omits it. On its own motion, the court also omits facts that are not relevant to this decision.

> The provisions of Article XVI of this Agreement shall be amended as described below for employees in active service . . . on the dates of the amendments . . . . The provisions of the Group Medical Plans *as they apply to current employees or to employees who retiree [sic] during the term of this Agreement* not specifically modified below will remain in full force and effect.

(emphasis added). In the previous CBA, the last sentence of Section 1 did not limit its application to active employees and future retirees; it said, simply, "[t]he provisions of the Group Benefit Plans not specifically modified below will remain in full force and effect." The parties dispute whether they changed the language because there was no need to say that current retirees' benefits would remain in full force and effect because no modifications were made to those benefits (the class's view), or to reflect that current retirees' benefits could in fact be changed during the course of the agreement (Boeing's view).

### 2. Negotiation History for the Current CBA

During the negotiations for the current CBA, neither Boeing nor the Union proposed any changes to health benefits for current retirees, including changes to the medical plans, prescription-drug programs, deductibles, or prescription-drug copayments. Boeing did, however, propose language limiting the provision of medical coverage (a paragraph in Article XVI, Section 6) only to future retirees. The corresponding paragraph in the 2002-05 CBA applied such medical coverage to then-current retirees. Boeing also proposed language that would limit this provision of coverage to "employees on the active payroll, on layoff, or on a leave of absence on December 31, 1992," rather than "eligible retirees who commenced receiving retirement benefits prior to January 1, 1993, as well as employees on the active payroll, on layoff, or on leave of absence on December 31, 1992," as it stated in the previous CBA.

Bruce Hanson, a Boeing senior manager of union pay and benefits, who participated in the negotiations for the current CBA, testified that the reason for Boeing's proposal was "to be

specific that our negotiations were for employees who retired during the term of the collective bargaining agreement and the medical benefits available to them upon retirement during the term of the agreement."

By letter dated November 22, 2005, Boeing responded, as relevant here, to the Union's inquiry about these proposed changes as follows: "As we explained on October 17, 2005, we are negotiating benefits for only those employees who will retire under the terms of this agreement. The language deleted refers to employees [retired] prior to the effective date of this agreement. Any changes to benefits for current retirees are not a subject of these negotiations."  Boeing reiterated this response in a letter to the Union dated February 17, 2006.

By letter dated February 13, 2006, the Union stated the following regarding medical benefits for current retirees: "Please not[e] that the Union continues to propose no changes to current retirees as proposed on 7/15/05, however, we do have open proposals on future retirees and we continue to wait for answers and information concerning the Company's proposals on future retirees."

By letters dated February 27, 2006, and March 10, 2006, Boeing again proposed different language that would limit the promise of medical coverage in Article XVI, Section 6 to "eligible employees who retire after the ratification date and prior to the termination date of this Agreement during the term of this agreement," and only "employees on the active payroll, on layoff, or on a leave of absence on December 31, 2006."

The Union opposed Boeing's proposals.  In response, close to the end of the negotiation process, Boeing agreed to leave the language in the current CBA the same as it was written in the 2002-05 CBA, with the exception of the inclusion of the phrase "same-gender domestic partner." Both Thomas A. Easley, Boeing's Director of Labor Relations, who participated in the

negotiations for the current CBA, and Joseph Sinni, who led the Union's negotiations, confirmed these facts.

On or about March 10, 2006, Boeing presented its best and final offer to the Union, which consisted of over one hundred pages. Easley's cover letter stated:

> All Articles, Appendices, and Attachments of the 2002-2005 Agreement have been reviewed in detail by the Company and Union negotiators. *Except as agreed to by the negotiators or set forth in this offer letter, all Articles, Appendices, and Attachments of the 2002-2005 Agreement will remain unchanged.* This constitutes The Boeing Company's entire proposal and is contingent upon the explicit understanding that *only those provisions which have been agreed to by the parties during these negotiations will be considered as part of this Agreement. All others will be considered as "off the table."*

(emphasis added).

During a "side bar" discussion, Easley told Sinni and Local 1069 President John DeFrancisco that Boeing "would be implementing and making changes to the existing, the current retirees," meaning "those retirees that had retired prior to the expiration of the agreement."

### 3. Details of Coverage

Historically, Boeing has issued insurance booklets, summary plan descriptions and benefit updates (also called "summaries of material modifications") that describe the benefits provided under the retiree medical plan. The insurance booklets and SPDs, as amended by the summaries of material modifications, include separate provisions for deductibles, co-payments and coinsurance, and contributions. Until 1989, descriptions of the medical benefits provided to retirees were included in the same booklet describing active employee benefits.

Two current SPDs, as later amended by the July 2006 Benefit Information Update for Retired Employees, describe the terms of the retiree medical plans effective July 1, 2000 for (a) individuals who retired before February 1, 1996, and (b) those who retired on or after February

1, 1996. The first is titled "Boeing Retiree Medical Plans Summary Plan Description, Retired Production and Maintenance Employees – UAW Local 1069/2000 Edition (Retired before February 1, 1996)," and the second is titled "Boeing Retiree Medical Plans Summary Plan Description, Retired Production and Maintenance Employees – UAW Local No. 1069/2000 Edition (Retired on or after February 1, 1996)"; both SPDs will be referred to as "Retiree SPDs." Both Retiree SPDs state that the Plan "is provided according to Article XVI of the collective bargaining agreement that became effective September 2, 1999" between Boeing and the Union.

Article XVI, Section 11 of the current CBA states, in relevant part: "The details of the . . . Medical, Dental and Vision Care coverages are set out in the Health Care Plans and Disability, Life, and Accident Plans Summary Plan Descriptions . . . ." (The parties dispute whether this refers only to the SPDs for active employees; the court will assume for present purposes that it refers to all of the 2000 SPDs, including the Retiree SPDs.)

The Retiree SPDs contain a "General Plan Provisions" section that states, "Although [Boeing] fully intends to continue the plans, it reserves the right (subject to the provisions of any applicable collective bargaining agreement) to change, modify, amend, or terminate them at any time." They also contain a "Termination of Coverage" section that states, "Coverage for an eligible retired employee, spouse, or surviving spouse is subject to the terms of the collective bargaining agreement between the Company and the collective bargaining representative . . . and any Company rights to amend or terminate the plan."

The 2000 SPD for pre-February 1, 1996 retirees (and their eligible dependents) provides medical benefits for both non-Medicare eligible and Medicare-eligible participants under the "Traditional Medical Plan." This includes the following deductibles, copayments and benefit payment levels:

        • Annual Deductible: per person - $75; families of three or more - $225.
        • Emergency Room Copayment: $25.
        • Prescription Drug Copayments: pharmacy - $2 generic and $5 brand-name; mail
        service program - $0 generic and $5 brand-name.
        • Covered services of network providers generally paid in full; covered services of
        nonnetwork providers paid at 70 percent of usual and customary charges in
        location where there are network providers, and at 100 percent of usual and
        customary charges where there are no network providers of any type.
        • Mental Health Treatment: Covered inpatient, partial hospital or intensive
        outpatient services obtained from provider referred by Boeing Helpline paid in
        full.
        • Substance Abuse Treatment: Covered inpatient, partial hospital, residential,
        intensive outpatient, or outpatient services obtained from provider referred by
        Boeing Helpline paid in full.

The 2000 SPD for post-February 1, 1996 (and their eligible dependents) provides for non-Medicare eligible participants the option of either the Traditional Medical Plan or a coordinated care plan. The latter option, which is like an HMO, covers services provided by network and nonnetwork providers. For Medicare-eligible participants, the SPD provides the option of the Traditional Medical Plan or a Medicare+Choice HMO. The Traditional Medical Plan for these retirees includes the same prescription-drug copayments, mental-health treatment coverage, and substance-abuse treatment coverage as for pre-February 1, 1993 retirees, with the following deductibles, copayments and benefit payment levels:

        • Annual Deductible: per person - $125; families of three or more - $375.
        • Emergency Room Copayment: $50.
        • Covered services of network providers generally paid in full; covered services of
        nonnetwork providers paid at 60 percent of usual and customary charges in
        location where there are network providers, and at 100 percent of usual and
        customary charges where there are no network providers of any type.

**B. Boeing's Unilateral Changes to Retiree Health Benefits, 2006-2009**

In July 2006, Boeing notified the retirees that it was modifying their health insurance benefits on September 1, 2006. The changes were described in a summary of material modifications titled "Benefit Information Update, Summary of Benefit Plan Changes and

Clarifications, Retired Employees Formerly Represented by UAW 1069." Annual deductibles for all retirees enrolled in the Traditional Medical Plan or the Medicare Traditional Indemnity Plan increased to $300 per individual and $600 or $900 per family. Other changes included: different provider options, including Aetna HMO, Aetna Medicare Advantage HMO, Keystone 10 HMO, Keystone Medicare Advantage HMO, and Regence Medicare Traditional Indemnity Plan; the office-visit copayment increased to $15; out-of-pocket maximums increased to $2000 per individual and $4000 per family; the emergency-room deductible increased to $50; and the co-insurance provisions changed, requiring retirees to pay at least 5% of their medical costs. Additionally, under all four HMOs, nonnetwork services and supplies are not covered except for emergency care, which is a change from the coordinated care plans they replaced. The Aetna HMO and the Keystone 10 HMO have higher office visit copayments than the coordinated care plans, which covered, with some limitations, office visits and most covered services from nonnetwork providers. Finally, the 2006 Benefits Update provides medical benefits for same-gender domestic partners of current retirees, and specifies that "effective September 1, 2006, Company contributions for the Medicare Part B premium reimbursement will be frozen at $88.50 per month for eligible retirees and dependents."

The changes to medical plan options, deductibles, copayments and benefit-payment levels set forth in the July 2006 Benefits Update generally track those set forth in the current CBA for active employees and future retirees. And, in a notice to participants, the Retiree Health Plan stated in relevant part:

> As a result of a new collective bargaining agreement, you can enroll in a new retiree medical plan or make certain dependent changes . . .
> **Traditional Medical Plan benefits and monthly contributions will change on September 1, 2006.** These changes are the result of a new collective bargaining agreement . . . . Also, note that for Medicare-eligible retirees, the

Traditional Medical Plan will change its name to the Medicare Traditional Indemnity Plan.

**Aetna and Keystone plan changes-if you're not eligible for Medicare.** For retirees not eligible for Medicare, the Aetna and Keystone coordinated care plans will become HMO plans beginning September 1, 2006.…

**Aetna and Keystone plan changes-if you are eligible for Medicare.** The Aetna and Keystone Medicare Supplement HMO plans won't be available after August 31, 2006. This change applies to a small number of retirees who were previously notified by mail. After August 31, the only plan available in the area in which you live will be the Medicare Traditional Indemnity Plan.

**Same-gender domestic partners are eligible for coverage.**

(emphasis in original).

### C. Boeing's Unilateral Changes to Retiree Benefits, 1987-2002

The recent changes are not the only unilateral changes that Boeing has made to retirees' health benefits. In the past, the changes generally tracked whatever amendments the parties negotiated for active employees' medical benefits.

<u>1. 1987 Changes</u>

From 1971 through 1986, the CBAs provided that retiree health insurance would be provided at Boeing's expense. During this period, the Plan generally did not require retirees to pay annual deductibles or a percentage of their incurred covered expenses ("coinsurance"), and there were no changes to the retirees' benefits.

During negotiations for the 1986 CBA, Boeing and the UAW agreed on a revised medical plan for active employees that introduced a preferred provider organization ("PPO") that required, for the first time, annual deductibles ($75 per individual and $225 per family) and coinsurance provisions. The parties also amended the language in Article XVI to provide that active employees would be provided benefits at no cost only until December 31, 1986.

Effective January 1, 1987, Boeing applied those same changes to retirees. Additionally, the retirees were required to make a $25 copayment for each visit to a hospital emergency room

that did not result in an immediate inpatient admission, and the Plan only paid a percentage of the charges for certain covered services and expenses (the coinsurance provisions). And in 1989, after soliciting the Union's comments, Boeing issued a new benefit booklet for retired production and maintenance employees, which described the new deductible, co-payment and coinsurance provisions. Prior to the issuance of this booklet for retirees, descriptions of their medical benefits were included in the same booklet describing active employee benefits.

Retiree Chapter President Jerry Patrone, a Local 1069 official who served on the 1986 bargaining committee, testified that retirees had expressed that they were unhappy about the changes. He testified that retirees complained to him about the imposition of deductibles, which they believed broke a promise by Boeing. Meanwhile, Local 1069 President DeFrancisco, who testified in his Federal Rule of Civil Procedure 30(b)(6) capacity on behalf of Local 1069, stated that the imposition of a $75 deductible per individual and $225 deductible per family in 1987 to then-existing retirees was a breach of the Company's commitment to those retirees. And in a letter dated March 10, 1987, the UAW informed Boeing that there might be litigation over a proposed CBA because of a dispute over the terms and conditions of the medical plan. But neither the UAW nor the retirees filed a lawsuit contesting the 1987 changes to retiree health benefits.

2. 1993-1994 Changes

On January 1, 1993, pursuant to a new CBA, Boeing began requiring retirees and surviving spouses "to contribute $100 a month for spouse medical coverage, if the spouse is eligible for coverage under another employer-sponsored plan as an active employee and waives such coverage." (The UAW and Mayfield plaintiffs dispute whether spouses previously were required to pay this cost.) That same year, the out-of-pocket maximum for coinsurance

provisions increased from $500 per individual and $1000 per family in 1989 to $1000 per individual and $2000 per family. Boeing also reduced the portion of the charges it would pay for health-care services from providers who were in the preferred network service area but who were not members of the network, from 80% to 70%. Finally, Boeing required retirees to pay copayments of $2 for generic drugs and $5 for brand-name drugs, with no copayments for mail-order generic drugs and $5 copayments for mail-order, brand-name drugs. Neither the Union nor the retirees sued over these changes.

In August 1994, Boeing issued a revised Retiree Medical Plan booklet describing the Plan's features as of January 1, 1993. The foreword to the 1993 Retiree Medical Plan booklet states that "Although the Company fully intends to continue the Plan, it reserves the right to change, modify, amend or terminate it at any time." And the "Plan Continuation" section of the 1993 Retiree Medical Plan booklet states, "The Company intends to continue this Retiree Medical Plan indefinitely, but reserves the right to change, amend, modify or terminate the Plan at any time."

### 3. 1996 Changes

According to minutes from a meeting during the 1996 negotiations, Boeing's Director of Labor Relations, Al Mansi, expressed the position that, even if he put in writing a statement that current retirees' benefits would not change, his "hands will not be tied. We will treat [current retirees] just as we are doing now. We believe we can make unilateral rights [sic]. We can do that in the future. We will not give you something that says we won't make changes." Subsequently, Boeing required individuals retiring on or after February 1, 1996 who were participating in the Traditional Medical Plan to pay annual deductibles of $125 for individuals and $375 for families.

4. 2002-2005 CBA

Boeing did not make unilateral changes during the term of the 2002-05 CBA. During negotiations for that CBA, Boeing told the Union that "there [would be] no change to existing medical benefits for current or future retirees for the life of this Agreement. Benefits, co-pays, etc. will remain the same as those in place during the term of the 1999 Collective Bargaining Agreement." The letter with that assurance was penned by Virginia J. Sauve, Director of Labor Relations for Boeing, and it was not included in the Articles, Appendices or Attachments of the 2002-05 CBA. Boeing did not make this assurance during negotiations for the current CBA.

**D. Vesting of Benefits**

Article XVI, Section 3 of the 1971-74 CBA was the first CBA to provide benefits to retirees. In contrast to the same section's language providing coverage for active employees "for the duration of this Agreement," the promise of coverage for retirees contains no durational limit:

> Effective December 1, 1968 a semi-private plan will be furnished by the Company at no cost to the employee for coverage of himself and his dependents for the duration of this Agreement. *The Company will provide Hospital-Medical-Surgical benefits for retirees, their spouses and eligible dependents, surviving spouses and eligible dependents* . . . . This will be a full service plan under Blue Cross and Blue Shield on a prevailing fee basis. *Where coverage can be integrated with Medicare-Part B, it will be so integrated and the Company will continue the payment of the Medicare Part B premium.*

(emphasis added). Similarly, Article XVI of the CBAs effective February 13, 1975, December 19, 1977, October 17, 1980, and October 31, 1983, explicitly states that medical benefits for active employees and their dependents will be furnished "for the duration of this Agreement," but there is no similar limitation for retirees and their dependents. Article XVI of the CBA effective Sept. 2, 1999 was the first to state that the Company will provide medical coverage "for

the duration of this agreement" for retirees and their dependents, and each CBA since then has included this language.

Each CBA also contains an article stating that the entire agreement remains in effect only up to a specific point in time. The cover page of the current CBA and Article XXIII state that it lasts from September 2, 2005 "until midnight at the close of October 1, 2009, and thereafter for yearly periods unless notice is given in writing. . . of [the Company or the Union's] desire to modify, amend or terminate the Agreement." The UAW has admitted that this clause applies to each provision in the CBA. And it has in the past provided notice of its intent to terminate the then-current CBAs—in 1971, 1995, 2002, and 2005. The Union also has provided notice of its intent to modify the Retirement Plan Agreement in 1971, 1995, and 2002; to modify the Supplemental Unemployment Plan in 1971; and to modify the Layoff Benefit and Security Program Agreement in 1995.

James Donahue was a UAW International Representative for Local 1069 between 1984 and 2002. He testified that, in sending notice to Boeing of the Union's intent to terminate a then-current CBA, he would do so "with the intentions of renegotiating a total collective bargaining agreement"—a completely new agreement. He further explained that his intention was to terminate the CBA "as it related to the active employees in those areas which were noted." According to Donahue, the Union would not terminate the Retirement Plan Agreement and the Layoff Benefit and Security Program Agreement because the Union "[is] not in the business of terminating pensions" and it did "not want to terminate [the layoff security benefit] program."

Former Local 1069 President Forte and Local 1069 President and Local 1069 Rule 30(b)(6) designee DeFrancisco testified that the Union distributes "highlight memoranda" to tout significant achievements that were made during negotiations, and to explain the nature and

extent of members' benefits. The Union has never signaled to its members by way of "highlight memoranda" that it has secured vested, lifetime health benefits for retirees.

Both Donahue and DeFrancisco admitted that there is no language clearly stating Boeing's commitment to provide vested lifetime health insurance benefits in the CBAs. Patrone and DeFrancisco testified, moreover, that they were not aware of any Union benefit proposal seeking, in writing, Boeing's promise to provide vested, lifetime retiree insurance benefits. The UAW notes, however, that Donahue, the UAW International Representative who negotiated the 1986, 1989, 1992, 1996, 1999 and 2002 CBAs, testified that, although he never submitted a written proposal for vested benefits, the UAW negotiated for lifetime health benefits in discussions throughout the bargaining history. Donahue admitted, however, that if he could draft the agreements without anyone disagreeing with his choice of words, he would use language stating that eligible retirees have vested benefits for the duration of their lives that cannot be changed. He said he did not negotiate for such language with employers because "[if] there was an understanding and it had always been adhered to and the obligation met, there was no need; or, because a company would not want to include something along those lines within the framework of the collective bargaining agreement because it would precipitate problems with the other labor unions they dealt with."

Sinni, the UAW 30(b)(6) designee, negotiated the 2005 CBA. He could not point to any language in the CBAs establishing that medical benefits for retirees are vested for life. And he testified that, "when the circumstances are right," it would be ideal to spell out in writing whether health insurance benefits were vested and could not be changed. But he stated that, throughout the years, Boeing and the Union "infer[red] or impl[ied]" that the benefits were for life, during negotiations. Sinni testified that this implicit understanding was passed down by

"word of mouth" within the Union, and from company representatives. And, according to Sinni, any negative changes to retiree benefits—including instituting annual deductibles and increasing prescription-drug copayments—"[w]ould be a violation of the promise made to that retiree, which we say is a lifetime vested benefit." According to Sinni, Easley and Hanson (of Boeing) had agreed with him that the benefits were vested, although they disagreed about whether they could make changes.

### III. LEGAL STANDARD ON SUMMARY JUDGMENT

A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, courts "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

The nonmoving party, in turn, may not rest on the allegations in its pleadings or conclusory statements in affidavits; it must support its contentions with evidence that would be admissible at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); Fed. R. Civ. P. 56(c). To avoid summary judgment, the nonmovant must do more than raise a "metaphysical doubt" as to the material facts. *See Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted). And "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

# IV. ANALYSIS

The heart of the parties' dispute is whether Boeing may make unilateral changes to the class's health benefits. The court first will consider whether such changes are prohibited under the current CBA. Because the court concludes that the current CBA does not restrict Boeing's right to make changes, like those here, that simply bring the retirees' benefits in line with those of active employees, the court also will consider whether the changes are prohibited because the retirees' benefits are vested at a particular level.

## A. Legitimacy of Boeing's Unilateral Changes to Retirees' Health Benefits Under the Current CBA

The Seventh Circuit has held that retiree health benefits, unlike pensions, do not vest as a matter of law. *See Bland v. Faitallis N. Am.*, 401 F.3d 779, 783 (7th Cir. 2005). Thus, absent agreement to the contrary, employers generally are free to modify or terminate retiree welfare plans. *See Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995); *Cherry v. Auburn Gear*, 441 F.3d 476, 481 (7th Cir. 2006); *Bland*, 401 F.3d at 783. To determine whether a contrary agreement was reached in the current CBA, the court reads the document as a whole, "so that all its parts will be given effect." *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th Cir. 1995). And it interprets the current CBA "in light of the concrete circumstances in which it was written." *Id.* A contract is ambiguous only if it is susceptible to more than one reasonable interpretation. *Id.* "The reasonableness of a proposed interpretation of contractual language requires consideration of the contract as a whole, including terms incorporated by reference." *Chicago Dist. Council of Carpenters Pension Fund v. K&I Construction, Inc.*, 270 F.3d 1060, 1069 (7th Cir. 2001).

According to the class, two sections of the current CBA operate together to bar Boeing's unilateral changes. First, Article XVI, Section 5 ("Medical Benefits"), which provides in relevant part:

> Medical benefit costs for eligible retirees and dependents will be paid as follows:
> 1. For eligible retirees who commenced receiving retirement benefits prior to January 1, 1993, as well as employees on the active payroll, on layoff, or on leave of absence on December 31, 1992, the Company will provide medical coverage for the duration of this agreement for retirees, their spouses, same-gender domestic partner, and eligible dependents, surviving spouses and eligible dependents of the following categories, except as described in Paragraph 5 below:
> > a. Of a pensioner who receives Company pension.
> > b. Of an active employee who died while eligible to retire.
> Where coverage can be integrated with Medicare -Part B for retirees, it will be so integrated. The Company will freeze the payment of Medicare – Part B premium of $88.50.
> . . .
> 4. Company contributions will be made only if such retiree authorizes deduction of the required contributions balance of such costs, if any, from the monthly retirement benefit payment or makes timely monthly payments of the required contributions.
> 5. The retired employee is required to contribute $100 a month to enroll a dependent spouse or same-gender domestic partner for Retiree Medical coverage if the spouse or same-gender domestic partner is eligible for coverage under another employer sponsored plan as an active employee and waives such coverage. In no case will the retired employee be required to contribute more than the greater of the amount required in Paragraph b. above, or this paragraph, to enroll such spouse or same-gender domestic partner.

Second, Article XVI, Section 11 ("Miscellaneous") of the CBA, which provides in relevant part:

> a. The details of the Group Life, Accidental Death and Dismemberment, Short-Term Disability, Survivor Income Benefit, Medical, Dental and Vision Care coverages are set out in the Health Care Plans and Disability, Life, and Accident Plans Summary Plan Descriptions which will be available to all participants.

The class contends that, through the latter section, the current CBA incorporates by reference the Retiree SPDs. And, by incorporating the SPDs, argues the class, the parties intended to fix the benefit levels in those SPDs for the duration of the agreement.

Boeing, for its part, does not dispute that under the current CBA it must provide medical coverage to retirees for the duration of the agreement. But Boeing contends that the CBA does not evidence any agreement about the retirees' cost-sharing obligations, let alone an agreement that benefits must remain fixed at the levels provided in the 2000 SPDs.

1. Boeing's Ability to Make Changes, Absent Incorporation of the Retiree SPDs

Before addressing the class's incorporation argument, the court considers whether there is any other language in the current CBA restricting Boeing's right to change the retirees' benefits. Section 5 provides that the retirees will receive "medical coverage" for the duration of the agreement. And in that section the parties also agreed about enrollment costs for current retirees' spouses and domestic partners, as well as Boeing's share of the Medicare Part B premium— features of coverage that would persist until the CBA expires. But there is otherwise no agreement about the *type* of coverage to which the retirees are entitled for the duration of the CBA—nothing about, for example, plan options, deductibles, coinsurance, and copayments. And there is no language providing that retirees would receive coverage under the terms of a particular plan.

Meanwhile, whereas in the 2002 CBA the parties had agreed in Article XVI, Section 1 that "the Group Medical Plans not specifically modified below will remain in full force and effect," in the current CBA the same clause says, "The provisions of the Group Medical Plans *as they apply to current employees or to employees who retiree* [sic] *during the term of this Agreement* not specifically modified below will remain in full force and effect." Applying the principle of *expressio unius est exclusio alterius*, this strongly implies that in the current CBA the parties did *not* intend to limit Boeing's ability to modify current retirees' benefits. But it need not prove that much: it is enough that the current CBA does not include an agreement that

the retirees' plans would "remain in full force and effect," given the presumption that retiree benefits do not vest. Accordingly, absent incorporation of the Retiree SPDs, there is no language in the current CBA restricting Boeing's right to change current retiree benefits.

### 2. Incorporation of the Retiree SPDs

The class argues that the parties incorporated by reference the Retiree SPDs in Article XVI, section 11 by providing that the "details of the Group . . . Medical . . . coverages are set out in the Health Care Plans . . . Summary Plan Descriptions." Boeing responds that section 11 does not even *refer* to the Retiree SPDs, let alone incorporate them.

The court concludes that both parties' interpretation of section 11 are reasonable. As both parties acknowledge, section 11 clearly refers to one or more of the health and welfare SPDs from 2000. But the words it uses—"the Health Care Plans . . . Summary Plan Descriptions"—does not identify by name any of the possible SPDs to which it could refer. The active employees' health-care SPD is titled "Health and Welfare Plans SPD," and the retirees' health-care SPDs each are titled "Retiree Medical Plan SPD," with different subtitles. Thus, because "Health Care Plans" could be read as an umbrella term for all of the available health-care plans, including those for the retirees, one could reasonably interpret section 11 to refer, at least in part, to the Retiree SPDs. At the same time, because section 11 does not explicitly reference the Retiree SPDs by name, Boeing's interpretation also is reasonable.

Assuming, for present purposes, that the parties intended the clause to refer to the Retiree SPDs, it is also both reasonable to infer an intent to incorporate the terms of the Retiree SPDs and reasonable not to infer such intent. The CBA says that the "details" of "coverages" are "set out" in the SPDs. Given the earlier promise of "coverage"—with its scope undefined—one could reasonably infer from this language an intent that the "details" in the SPDs provide such

definition. At the same time, the parties did not use explicit language of incorporation—they did not say, for example, that those SPDs are "hereby made part of this agreement." This is in contrast to other, explicit language of incorporation in the current CBA: Article VI, Section 3, for example, states that "[a] list of all job classifications, job family groupings, and proper labor grades as existing on the effective date of this Agreement are outlined in the appendices and are made a part of this Agreement." In short, section 11 is ambiguous.

The problem for the class is that, even assuming that the current CBA incorporates the Retiree SPDs, it does not reflect an agreement that the benefits remain fixed at the levels provided in those documents. First, even if the benefits outlined in the Retiree SPDs could define the scope of the retirees' "coverage," it doesn't naturally follow that those benefits must be provided for the duration of the CBA. Section 5 assures the *fact* of coverage for the duration of the agreement; it does not provide that the *details* of coverage are fixed for that term. Meanwhile, section 11 says that the details of coverage are in the SPDs, but it is silent about whether those details are fixed for the duration of the agreement. This is in contrast to the contract in *Pabst Brewing Co. v. Corrao*, 161 F.3d 434 (7th Cir. 1998), where the duration clause applied both to the fact of coverage and to the "details" of the plan: "For the term of this Agreement, the Employer, at its sole cost and expense, shall provide major medical, health, dental, sickness and accident, and life insurance benefits in accordance with and as summarized in Appendix A attached." *Id.* at 435-36. The Seventh Circuit ruled that the effect of this was to read along with each detail in "Appendix A" the phrase "for the duration of the CBA." Here, it would stretch the bounds of the parties' expressed intent to apply Section 5's durational term to each provision of a document incorporated in Section 11.

More importantly, the Retiree SPDs both contain reservation of rights clauses, which provide that, "[a]lthough The Boeing Company ("the Company") fully intends to continue this plan, it reserves the right (subject to the provisions of any applicable collective bargaining agreement) to change, modify, amend, or terminate it at any time." They also contain a clause that says, "coverage for an eligible retired employee, spouse, or surviving spouse is subject to the terms of the [CBA] between the Company and collective bargaining representative . . . and any Company rights to amend or terminate the plan." Thus, if the Retiree SPDs are incorporated into the current CBA, then Boeing's reservation of its right to modify the plan is incorporated, too. *See UAW v. Rockford Powertrain, Inc.*, 350 F.3d 698, 704-05 (7th Cir. 2003) ("The CBA's incorporation of the Insurance Agreement necessarily incorporated the reservation of rights clause found in the plan description.") Because this fully incorporated agreement would then have to be read to effectuate each of its terms, *see Murphy*, 61 F.3d at 565, it would say this: "Boeing shall provide medical coverage to current retirees, their spouses, same-gender domestic partners, and dependents for the duration of the agreement, but it reserves the right to change, modify, amend, or terminate the Retiree plans at any time." Thus, Boeing may make changes without violating the current CBA, even if the Retiree SPDs are incorporated. Indeed, Boeing could terminate the current Retiree plans, as long as it continued to provide medical coverage for the retirees—access to the active employees' plan, for example, could suffice.

### 3. Nullification of the Promise of Coverage

Having concluded that Boeing may make changes to the retirees' benefits under the terms of the current CBA, a question remains: To what extent could Boeing make changes before breaching its obligation to provide coverage for the duration of the agreement? The class's concern is that, through unilateral reductions *ad infinitum* of the retirees' benefits, Boeing could

effectively "cover" nothing—an understanding of Boeing's power that the parties clearly did not reach. So what is the baseline?

The class contends that the absence of negotiations about changes to retiree benefits, combined with the promise of coverage (despite Boeing's initial efforts to exclude retirees entirely from the current CBA) show that the parties intended the scope of coverage to remain the same—i.e., at the level provided in the Retiree SPDs—and that this would least upset the parties' expectations. But the absence of negotiated changes is not the same as a relinquishment of Boeing's right to change the retirees' benefits. As explained *supra*, the default rule is that Boeing may make changes to retiree benefits at any time. *See Curtiss-Wright*, 514 U.S. at 78; *Cherry*, 441 F.3d at 481; *Bland*, 401 F.3d at 783. In the current CBA, the parties restricted this right only to the extent that Boeing must provide "coverage"; but there is no evidence that they understood "coverage" to mean, exclusively, "the benefit levels in the Retiree SPDs."

Meanwhile, the court does not agree with Boeing's contention that a promise of coverage reflects *no* agreement about cost-sharing. Boeing relies on Judge Easterbrook's dissent in *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603 (7th Cir. 1993) (en banc)*,* but his point—that there is a difference between a promise of coverage and a promise of free medical care—is non-responsive here. *See id.* at 615 (Easterbrook, J., dissenting). The retirees do not contend that Boeing must provide *free* medical care; they recognize their own cost-sharing obligations. The extent, not the existence, of those obligations is at issue.

*Senn v. United Dom. Indus.*, 951 F.2d 806 (7th Cir. 1992), the other case upon which Boeing relies, is more instructive. There the retirees were promised "coverage" under an applicable CBA. *Id.* at 810. They argued, however, that their former employer could not require them to pay the cost difference between an HMO plan and a conventional health insurance plan

(a new cost-sharing arrangement introduced in the applicable CBA) because they had vested rights to benefits. The Seventh Circuit disagreed, explaining that because the retirees' rights were not vested, they were not entitled to a specific type of coverage at a particular cost. *Id.* at 816. Therefore, the cost-sharing arrangement that the employer and union had negotiated could apply to the retirees without violating the promise of coverage.

Similarly although here the term "coverage" is not explicitly defined, the benefits provided to active employees would certainly qualify. First, in the current CBA the parties used the word to describe the medical benefits for active employees ("The current medical benefits coverage for eligible employees and dependents is continued subject to the following coverage revisions . . ."). Since the parties understood *that* arrangement to be "coverage," it follows that changes to retiree benefits that put them in line with those of active employees would not nullify the promise of "coverage." Second, this understanding is consistent with the history of Boeing's unilateral changes, which reflects a trend: in 1987, 1993, and 1996, the company applied changes negotiated for active employees to current retirees. Although the retirees and the Union initially protested these changes, they never sued, and their later silence implies an acquiescence to Boeing's assertion of this right. Meanwhile, although Boeing did not make changes during the term of the 2002 CBA, that year Boeing had explicitly agreed that it would not change the retirees' benefits, and there was no similar agreement during negotiations for the current CBA— indeed, Boeing explicitly asserted its right to change retiree benefits. Accordingly, the September 2006 and July 2009 changes, because they simply extend features of the active employees' benefits to the retirees, are well within Boeing's rights, and they do not nullify the promise of coverage.

**B. Vesting of Benefits**

The final issue is whether the retirees' health benefits were vested under the terms of another agreement, in which case they are "forever unalterable." *Bland*, 401 F.3d at 784. If so, Boeing's unilateral changes in September 2006 and July 2009 would violate that agreement.

"ERISA does not require the vesting of welfare benefits," so if the retirees' health benefits "vest at all, they do so under the terms of a particular contract." *Pabst Brewing Co. v. Corrao*, 161 F.3d 434, 439 (7th Cir. 1998); *Barnett v. Ameren Corp.*, 436 F.3d 830, 832 (7th Cir. 2006); *UAW v. Rockford Powertrain*, 350 F.3d 698, 702 (7th Cir. 2003). "[B]ecause employers are not legally required to vest benefits, the intention to vest must be found in clear and express language." *Bland*, 401 F.3d at 784 (quotation marks omitted). The parties need not use the word "vest," nor must they "state unequivocally" that the employer is creating rights that will not expire. *Id.* But without language suggesting that benefits are vested, "the presumption is that benefits terminate when a collective bargaining agreement ends." *Cherry*, 441 F.3d at 481. "This presumption can be rebutted by extrinsic evidence only if an ambiguity exists in the contractual language or if there is a yawning void that cries out for an implied term." *Id.* (internal quotation marks, ellipses and citation omitted).

In *Rossetto*, the Seventh Circuit summarized the vesting rules as follows:

1. If a collective bargaining agreement is completely silent on the duration of health benefits, the entitlement to them expires with the agreement, as a matter of law . . . unless the [retirees] can show by objective evidence that the agreement is latently ambiguous . . . .

2. If the agreement makes clear that the entitlement expires with the agreement, as by including such a phrase as 'during the term of this agreement,' then, once again, the [retirees lose] as a matter of law unless [they] can show a latent ambiguity by means of objective evidence . . . .

3. If there is language in the agreement to suggest a grant of lifetime benefits, and the suggestion is not negated by the agreement read as a whole, the [retirees] [are] entitled to a trial. Of course, if the agreement expressly grants such benefits, the [retirees] [are] entitled, not to a trial, but to judgment in his favor . . . .

38

> 4. If the [retirees are] entitled to a trial by reason of either a patent or a latent ambiguity, the normal rules of evidence will govern the trial, and so the parties will not be limited at trial to presenting objective evidence of meaning.

*Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 547 (7th Cir. 2000).

Here, the class points to no language within the CBAs or plan documents providing for the vesting of retiree health benefits. Representatives of the union confirmed in their testimony, moreover, that they were aware of no such language. There also is no language that benefits would continue beyond the term of each CBA, let alone for the rest of the retirees' (or their survivors') lives. Meanwhile, in the Retiree SPDs, Boeing explicitly reserved its right to change, modify, or terminate the retirees' medical plan. And as far back as 1993, in the "Plan Continuation" section of the 1993 Retiree Medical Plan booklet, it states, "The Company intends to continue this Retiree Medical Plan indefinitely, but reserves the right to change, amend, modify or terminate the Plan at any time."

Without any clear expression of an intent to vest the retirees' benefits, the class relies on what it argues is a patent ambiguity in the 1971-1983 CBAs: these agreements include a durational limitation for active employees' medical coverage, but not for the retirees. Specifically, these CBAs say only that "the Company will provide [health] benefits to [current retirees] . . . ." And they argue that, as a result, there is a latent ambiguity in the CBAs beginning in 1999, which provide that medical coverage for both active employees and retirees would last for the duration of the agreement.

"When an ambiguity is apparent just from reading the contract without having to know anything about how it interacts with the world—then the contract has what is called a patent, or intrinsic, ambiguity, and evidence is admissible to cure it." *Cherry*, 441 F.3d at 482 (quotation marks and internal citations omitted). A latent ambiguity, on the other hand, can arise in a

contract that is "clear on its face" (to the uninformed reader), but is in fact susceptible to more than one interpretation when applied to a particular dispute. *Rossetto,* 217 F.3d at 542.

Here, the 1971-1983 CBAs are ambiguous regarding the duration of retiree benefits, but they cannot reasonably be interpreted to vest those benefits for life. Normally their silence would trigger a presumption that the benefits expire at the end of each agreement. But because these CBAs explicitly limit the duration of active employees' benefits to that term—but do not do so for the retirees' benefits—one could reasonably infer, under the principle of *expressio unius est exclusio alterius*, that the parties did not intend to limit the duration of the retirees' benefits to that term. This ambiguity, though, does not help the retirees. At most, the retirees could show from the ambiguous language that the parties intended the benefits to continue beyond each agreement; that is not the same as an intent to vest the benefits for life. The language is far weaker than any Seventh Circuit case that has found a promise of vested benefits: it does not state that the benefits are "vested," "shall continue," are provided "for life" or "until death," and it does not suggest that they last beyond the retirees' death. *See generally Bland*, 401 F.3d at 785-86 (collecting examples of strong, ambiguous, and weak vesting language).

Because the parties never expressed a clear intent to vest retirees' benefits, the parties' later introduction of durational limits does not create a latent ambiguity. Rather, any ambiguity about the duration of benefits in the earlier CBAs was resolved in the 1999 CBA, which explicitly limited retiree medical coverage to the term of the CBA, regardless of when the retirees had retired. *See Pabst Brewing Co. v. Corrao*, 161 F.3d 434, 441-42 (7th Cir. 1998) (affirming dismissal of retiree's lifetime benefit claims and finding no ambiguity where the clause "for the term of the agreement" was added to the 1984 and subsequent CBAs, but was

absent from prior agreements.)  The parties' intent, moreover, has been reaffirmed in each successive CBA, which include this durational limitation.

The class's evidence of a contrary intent is extremely limited.  There is only the testimony of union representatives that the parties had "an implicit understanding" that the benefits were vested.  But their own subjective view is not enough to establish a latent ambiguity.  *See Corrao*, 161 F.3d at 442.  Proof that their interpretation is reasonable must come from objective facts, and "[e]vidence is not objective when it is the self-serving testimony of one party to the contract as to what the contract, clear on its face, 'really' means, contrary to what it seems to mean."  *Rossetto*, 217 F.3d at 546.  In any event, the representatives' testimony as to their subjective belief is contradicted both by their agreement to apply durational limitations to the retirees' medical coverage and by their failure to challenge Boeing's  unilateral changes in 1987, 1993, and 1996.

Accordingly, the court concludes that Boeing's September 2006 and July 2009 changes do not violate any agreement to provide vested benefits to retirees, as no such agreement was reached.[2]

## III. CONCLUSION

For these reasons, the UAW's motion for summary judgment is GRANTED in part: the court DISMISSES for lack of jurisdiction Boeing's ERISA and LMRA claims against the UAW on behalf of the retirees, and the court DENIES the motion as to Boeing's LMRA claims against the UAW as an entity; Boeing's motion for summary judgment against the class and the UAW is GRANTED with respect to those claims over which the court has exercised jurisdiction; and the class's motion for summary judgment is DENIED as moot.  It is so ordered.

[2] Because the court concludes that the retirees are not entitled to vested, lifetime health benefits, it declines to consider Boeing's argument that pre-1993 retirees' claims for vested benefits are time-barred.

Enter:

/s/ David H. Coar

_____

David H. Coar
United States District Judge

Dated: **September 9, 2009**